Filed 6/11/26  In re R.H. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re R.H. et al., Persons Coming Under the Juvenile Court Law. | |
| | E086751 |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | (Super.Ct.Nos. J302132, J302133) |
| Plaintiff and Respondent, | OPINION |
| v. | |
| J.D. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Annemarie G. Pace, Judge.  Affirmed.

Nicole Kronberg, under appointment by the Court of Appeal, for Defendant and Appellant, J.D.

Brent Riggs, under appointment by the Court of Appeal, for Defendant and Appellant, D.H.

1

Laura Feingold, County Counsel, and Joseph R. Barrell, Deputy County Counsel, for Plaintiff and Respondent.

## INTRODUCTION

J.D. (mother) is the mother of S.M. and R.H. (the children). D.H. (father) is the father of R.H. Mother filed a Welfare and Institutions Code[1] section 388 petition as to the children, which the court denied. The court also terminated mother's and father's parental rights. Mother and father have filed separate briefs on appeal. Mother contends the court erred by: (1) denying her an evidentiary hearing on her section 388 petition; and (2) finding the parental-benefit exception to termination of parental rights inapplicable. (§ 366.26, subd. (c)(1)(B)(i).) Father contends that: (1) the court deprived him of constitutional due process since it failed to serve him with a JV-505 form, pursuant to section 316.2, subdivision (b), to inquire of his paternal status regarding S.M.; and (2) his attorney rendered ineffective assistance of counsel (IAC) by failing to seek presumed father status for him regarding S.M., even though he qualified as an "equitable father," and by failing to appeal from the jurisdictional findings. Father also joins in mother's arguments. We affirm.

## PROCEDURAL BACKGROUND

On September 16, 2024, the San Bernardino County Department of Children and Family Services (CFS) filed a section 300 petition regarding R.H.,

---

[1] All further statutory references will be to the Welfare and Institutions Code unless otherwise indicated.

who was less than one month old at the time. The petition alleged that he came within the provisions of subdivision (b) (failure to protect). It specifically alleged that both mother and father had substance abuse problems that interfered with their ability to parent R.H.

On the same day, CFS also filed a petition regarding S.M., who was two years old at the time. This petition listed mother and J.M. as her parents, and it alleged that S.M. came within the provisions of section 300, subdivisions (b) and (g) (no provision for support). Specifically, the petition alleged that mother had a substance abuse problem that interfered with her ability to parent S.M., and that J.M.'s whereabouts were unknown and he left S.M. without provisions for care or support.

In a detention report, the social worker stated that CFS received a referral alleging general neglect when mother gave birth to R.H. Mother tested positive for amphetamines and said she did not receive prenatal care throughout her pregnancy. She said she had a history of taking drugs but denied taking any while she was pregnant. Mother said she lived with her boyfriend (father), who was R.H.'s father. She stated that S.M. lived with the great maternal aunt, M.H. (the GMA). The social worker requested that father submit to a drug test on August 29, 2024, and the results came back positive for amphetamines.

The social worker interviewed father, who said he tried drugs in his youth, but claimed he had not done drugs since then. Father requested a paternity test regarding R.H., which he said he was requesting because he was much older than

mother.  Father told the social worker he owned the home they lived in, and he worked full-time, and that if R.H. was not his child, he would still care for mother and both R.H. and S.M.  Father said he had been a father figure to S.M. since she was eight months old.

The court held a detention hearing on September 17, 2024.  Mother appeared and informed the court that father was R.H.'s father, but she was not married to him or anybody else.  The court asked where father currently was, and she said he was at home.  The court then asked who S.M.'s father was, and mother said J.M. was a possible father.  When asked who else was a possible father, mother said there were three others, including a man named Eric, and she forgot the others' names.  The court asked if anyone signed paternity paperwork when S.M. was born, and she said no.  Mother also confirmed that no man had lived with S.M. as her (S.M.'s) father.  When the court asked if mother had a way to contact any of the three possible fathers, she said she contacted J.M. through Facebook Messenger, but he blocked her.  The court found that a prima facie case had been made for detention of the children, and it ordered visitation for mother, but none for father.

*Jurisdiction/Disposition*

On October 3, 2024, the social worker filed a jurisdiction/disposition report recommending that the court sustain the petition, declare the children dependents, remove them, place them in out-of-home care, and order reunification services to be provided to mother and father.  The social worker further recommended that the

4

court find father to be the presumed father of R.H. and find J.M. to be the alleged father of S.M., not entitled to reunification services. The social worker noted that the children were placed together in the MGA's home.

The social worker reported that mother tested positive for amphetamines on September 17, 2024, and September 25, 2025; nonetheless, she kept insisting she was not using drugs. The social worker met with mother, who said she had not used drugs since March 11, 2020, except that she "slipped one time" when she gave birth to R.H. and tested positive. Mother said she started using amphetamines when she was 14 years old and only used once at that age and then stopped using until she was 17. When asked if she drank alcohol, mother said she drank a bottle of wine every two days. She denied using drugs, but then asked if she would be allowed to smoke a joint to calm her nerves.

The social worker further reported that father tested positive for amphetamines on August 30, 2024, and September 30, 2024. He reported that he did not drink alcohol, but admitted he used methamphetamine and marijuana. Father stated that S.M. was already born when he met mother, and he became part of her life when she was eight months old. He said he claimed her as his own. The social worker reported that J.M.'s whereabouts were still unknown.

The social worker stated that she supervised the first visit between the children and the parents on September 23, 2024. Mother brought S.M. age-appropriate toys and fed R.H. and changed his diaper. The social worker described the visit as "appropriate."

5

The social worker met with the MGA, who agreed to supervise visits between mother and the children.

On October 8, 2024, the court held a jurisdiction/disposition hearing. Father and mother were present, represented by counsel. The court sustained the petitions, declared father to be the presumed father of R.H. and J.M. to be an alleged father of S.M., not entitled to services. The court declared the children dependents, removed them, and placed them in CFS's care, custody, and control. It then ordered services for mother and father and increased their visits to twice a week, plus supervised telephone contact. The court stated that no visitation or services would be ordered for the alleged father of S.M. Mother's and father's case plans required them to participate in individual therapy, a parenting education program, random substance abuse testing, and an outpatient substance abuse program.

*Six-month Status Review*

The social worker filed a six-month status review report on April 3, 2025, recommending that the court continue services. She reported that CFS had minimal to no contact with mother and no contact with father. She tried to reach them by telephone, but there was no response. The social worker reported mother and father were living together in Apple Valley, and they made little effort to participate in their services. Mother was given referrals for individual therapy, an outpatient program, and a parenting program. She attended three therapy sessions

6

during October 2024 and November 2024 but did not attend the rest of the sessions. Her therapy services were terminated for non-attendance.

Mother attended an intake appointment for a parenting education program on October 8, 2024, but failed to attend the scheduled second assessment; thus, she was terminated due to non-compliance. As of March 17, 2025, mother had enrolled in another parenting program.

As to random drug testing, mother tested positive for amphetamines on October 24, 2024, and then missed nine tests from November 2024 to March 2025. The missed tests were considered positive tests.

On September 24, 2024, mother completed an intake at an outpatient program at High Desert Center (hereinafter, High Desert) but was terminated for non-attendance. She was referred to a residential program at High Desert in January 2025, but her chart was closed out, as she did not respond to attempts to reach her.

The social worker reported that father attended five therapy sessions only before his therapy services were terminated for lack of further attendance. Although he attended the intake appointment for a parenting education program, his parenting education services were terminated for non-attendance thereafter. Father did not complete any random drug testing from October 2024 to February 2025, missing ten appointments. He completed an intake at High Desert, but was terminated on October 25, 2024, for non-attendance. However, as of March 2025,

7

he returned to High Desert and started attending. While at the program, he drug tested positive for methamphetamine.

The social worker additionally reported that the parents' visits with the children were inconsistent. Further, mother appeared to be under the influence at visits and had minimal interaction with the children, and she ended visits early. Reportedly, father had some interaction with the children, as he held and fed R.H., and ate and played with S.M.

The social worker reported that the children appeared comfortable in their placement, reaching for the MGA and her husband (the caregivers) for comfort and referring to them as "grandma and grandpa." The caregivers loved being able to provide an adequate environment for them and meeting their needs. S.M. was bonded with them, showed affection, and played with them.

The court held a six-month review hearing on April 8, 2025, with mother and father present. Counsel for the children requested that the court terminate services. County counsel argued for continuing services since the parents were visiting the children, and the quality of the visits had improved, and because the parents were now participating in services, albeit late. County counsel acknowledged that the children were in a concurrent planning home but did not believe that delaying the case for six more months to attempt to reunify with the children would be prejudicial.

The court stated it had to look at establishing permanency for two children who were removed under the age of three. Based on their ages, the parents' lack

8

of completion of any part of the case plan, and their prior inconsistent visits, the court concluded that the parents had simply not made enough progress. Although they were now engaged in services, the court found it was "a little too late" to now say they were committed to completing them. The court terminated services and set a section 366.26 hearing. It kept the visits at once a week and told the parents they could continue doing their services but informed them that it had set a hearing to establish a permanent plan, and if they wished to preserve their right to appeal the court's decision, they had to file a petition for extraordinary writ.

*Mother's Section 388 Petition*

On July 25, 2025, mother filed a section 388 petition asking the court to change its order terminating services and grant an additional six months of services. As to the changed circumstances, she alleged that she completed an outpatient program at High Desert on June 16, 2025, tested negative there for the past three months, and was enrolled in their aftercare program. Mother alleged she also completed eight sessions of individual therapy and was continuing to participate in therapy. She was also currently enrolled in a parenting program that she was scheduled to complete in September 2025. Additionally, mother was having consistent, positive visits with the children.

As for best interests of the child, mother alleged that she had a strong bond with S.M. prior to removal, that she was visiting now and trying to maintain her bond with S.M. and build a bond with R.H. Mother alleged that not giving her more services would result in severing her bond with S.M., which could result in

9

psychological trauma to S.M.  Mother also alleged that having a relationship with their biological mother could benefit the children in the future, if they suffered from an illness or disease and needed a donor.

The court summarily denied mother's petition, finding that mother's request did not state new evidence or a change of circumstances and that the proposed change of order did not promote the children's best interests.

*Section 366.26*

On August 1, 2025, the social worker filed a section 366.26 report, recommending that the court terminate parental rights and implement the permanent plan of adoption.  The social worker reported that the children had only had one placement and had been with the caregivers since September 12, 2024. The children were emotionally bonded with them, and the caregivers desired to adopt them.  The caregivers were committed to meeting their social, medical, psychological, and financial needs on a permanent basis.  The social worker stated that the children were appropriate for adoption and recommended they be adopted by the caregivers.

The social worker additionally reported that the parents struggled to remain consistent in the children's lives.  They were inconsistent in their visitation, although they had begun to improve their contact and were engaging more appropriately.

*Father's Section 388 Petition*

On August 6, 2025, father filed a section 388 petition asking the court to change its order terminating services and grant an additional six months of services. As to changed circumstances, he alleged that he had been attending an outpatient program at High Desert since July 5, 2025, and all his drug tests in July were negative. He was projected to complete the program on October 3, 2025 and would then attend the aftercare program. Father alleged that he had been working hard to complete his case plan and had been regularly visiting R.H.

As for best interests of the child, father alleged that six more months of services would allow him more time to gain more insight into necessary parenting techniques for R.H. Father also alleged that it was important for R.H. to be with his biological father for his development and because they were bonded. Father alleged that he fully engaged with R.H. during visits and more services would help him to be the best dad he could be for R.H.

The court summarily denied father's petition, finding that father's request did not state new evidence or a change of circumstances and that the proposed change of order did not promote R.H.'s best interests.

Additional Information to the Court (CFS 6.7 Report)

On August 18, 2025, the social worker filed a CFS 6.7 report, stating that, at the April 8, 2025, hearing, the court ordered supervised visits, once a week. Since then, the parents had visited the children 17 times, from April 2025 to August 2025. The caregiver reported that the parents appeared to be sober at

11

visits, arrived on time, and stayed for the entire visits. They interacted appropriately with the children, eating with them, playing with them, and showing affection to them. When the CFS staff started supervising the visits at the CFS office, they observed that the parents brought food, games, books, blocks, and coloring books. The parents praised R.H. when he attempted to stand or crawl. S.M. was observed to be happy and smiling, and she wanted to be held by them. S.M. called them "mommy and daddy" and said, "I'm a daddy's girl." R.H. was also observed to be calm and smile with the parents. Although the children were happy throughout the visits, they were fine after the visits and were ready to return to the caregivers.

*Section 366.26 Hearing*

The court held a contested section 366.26 hearing on August 19, 2025. Mother's counsel called the social worker to testify. She testified that the caregiver supervised visits when they were in the community, but mother requested the visits to be moved to the CFS office in July 2025, and she (the social worker) then supervised some of the visits. The social worker testified that S.M. laughed and smiled during visits and was very happy to see her mom.

Mother testified next. She testified that father was R.H.'s father, and J.M. was S.M.'s father. She also testified about her visits with the children, stating she would bring S.M. bubbles to play with, S.M. was very happy to see her and played with her, and S.M. was upset at the end of visits. Mother testified that S.M. was happy to see father too, and that S.M.'s father was J.M., but to her, father was

12

"Daddy." Mother also testified that she would hold and feed R.H. and change his diapers. She said she was currently pregnant and that if the court terminated parental rights, it would affect the children since they would not get to grow up with their new baby brother.

Mother's counsel argued that the parental-benefit exception to the termination of parental rights applied, citing *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*). He asserted that S.M. had lived with mother for the majority of her life, recent visits had improved, and it would damage her mental well-being if her relationship with mother was severed. Father's counsel argued that the parents' visits were consistent and went well, the children were bonded with father, and in light of the evidence presented that day, the court could not find that the benefits of adoption outweighed the detriment of terminating parental rights.

The court found the children adoptable and stated there was no dispute that the parents had consistent visits with the children. As to R.H., the court found that, regarding the first two prongs of *Caden C.*, the parents did not meet their burden to show a substantial bond. The court noted R.H. was happy and comfortable with them, but he was only two weeks old at the time of removal, and he was about to turn one. The court also found the parents had not met their burden under the third prong of *Caden C.* to show that the detriment of terminating parental rights would outweigh the benefits of adoption.

As to S.M., the court found that mother had shown under the second *Caden C.* prong that S.M. had a substantial attachment to her. The court believed

13

S.M. was attached to father but noted that father had never been found to be her presumed father. As to the third *Caden C.* prong, the court believed there would be some detriment to S.M., but she was under three years old when removed, and she was in a concurrent planning home with a relative who was going to also provide permanency to her brother, R.H. Thus, any detriment from terminating parental rights would be outweighed, at S.M.'s young age, by the benefits and permanency of adoption. The court terminated mother's and father's parental rights.

DISCUSSION

I. The Court Properly Denied Mother's Section 388 Petition

Mother argues the juvenile court abused its discretion in summarily denying her section 388 petition. She claims she established a prima facie case since her completion of a three-month substance abuse program after the termination of services and continued participation in aftercare was a significant change. She contends this progress, combined with her strong bond with the children and continued sobriety, "showed that she could be a healthy parent," and that it was in the children's best interests for the court to give her additional time to reunify. We disagree.

A. Relevant Law

"A juvenile court order may be changed, modified or set aside under section 388 if the petitioner establishes by a preponderance of the evidence that (1) new evidence or changed circumstances exist and (2) the proposed change would

14

promote the best interests of the child. [Citation.] A parent need only make a prima facie showing of these elements to trigger the right to a hearing on a section 388 petition and the petition should be liberally construed in favor of granting a hearing to consider the parent's request. [Citation.] [¶] However, if the liberally construed allegations of the petition do not make a prima facie showing of changed circumstances and that the proposed change would promote the best interests of the child, the court need not order a hearing on the petition." (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806; Cal. Rules of Court, rule 5.570.) "In determining whether the petition makes the necessary showing, the court may consider the entire factual and procedural history of the case." (*In re Justice P.* (2004) 123 Cal.App.4th 181, 189.)

We note that "[a]fter the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' [citation], and in fact, there is a rebuttable presumption that continued foster care is in the best interests of the child. [Citation.] A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*).)

B.  The Court Did Not Abuse its Discretion

The court declined to order a hearing on mother's section 388 petition because it concluded she had failed to demonstrate changed circumstances and the proposed change of order did not promote the children's best interests.  We find no abuse of discretion in this decision.

Mother asserts she first got sober without professional help and raised S.M. for almost three years; further, her participation in the High Desert program was the first time she received any professional help for the addiction she had struggled with since she was a teenager.  Notably, although mother completed the three-month treatment program, the evidence showed she tested positive for methamphetamine during her treatment, on April 16, 2025.  Given her poor performance during the reunification period and only recent participation in her services, mother failed to show that her circumstances had actually changed.

Further, mother failed to show it would be in the children's best interests to give her additional services.  Her petition merely alleged she felt that more services would be in their best interests because, if the court did not allow more services, her strong bond with them would be severed, which could result in psychological trauma to S.M.  Mother also alleged the children could benefit from a relationship with her if they needed a donor in the future.  She reiterates her position on appeal by asserting that her completion of the High Desert program and continued aftercare, in conjunction with her strong relationship with the children, met her prima facie burden to warrant a hearing.

16

Mother fails to show why it would be in the children's best interests to provide her with more services. Although she was bonded with the children, her claims of psychological trauma to S.M. and the children needing a donor in the future were pure speculation.

Moreover, the juvenile court properly recognized the shift of focus from mother's interest in the care and custody of the children to their need for permanency and stability. (*Stephanie M., supra*, 7 Cal.4th at p. 317.) The children had lived in a stable home environment with the caregivers since September 12, 2024. The children were bonded with them, and they were committed to meeting the children's needs on a permanent basis by adopting them.

We conclude the court did not abuse its discretion in denying mother a hearing on her section 388 petition. Mother's petition did not demonstrate changed circumstances and the facts alleged in the petition did not support a conclusion that the children's best interests would be served by the requested order.

## II. The Parental-Benefit Exception Did Not Apply

Mother contends the court erred in not applying the beneficial parental relationship exception under section 366.26, subdivision (c)(1)(B)(i). We disagree.

### A. Relevant Law

At a section 366.26 hearing, the court determines a permanent plan of care for a dependent child. (§ 366.26.) Adoption is the permanent plan preferred by

17

the Legislature.  (*In re Celine R.* (2003) 31 Cal.4th 45, 53.)  If the court finds that a child may not be returned to his or her parents and is likely to be adopted, it must select adoption as the permanent plan, unless it finds a compelling reason for determining that termination of parental rights would be detrimental to the child under one of the exceptions set forth in section 366.26, subdivision (c)(1)(B).

One such exception is the parental-benefit exception set forth in section 366.26, subdivision (c)(1)(B)(1).  (See *In re Jerome D*. (2000) 84 Cal.App.4th 1200, 1206.)  It requires that "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)

Our Supreme Court discerned "three elements the parent must prove to establish the exception:  (1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child."  (*Caden C., supra*, 11 Cal.5th at p. 631.)  As *Caden C*. indicates, the second and third elements of the exception are inextricably connected.

The court in *In re Autumn H.* (1994) 27 Cal.App.4th 567 (*Autumn H.*) recognized this connection when it interpreted "the 'benefit from continuing the [parent/child] relationship' exception to mean the relationship promotes the well-being of the child *to such a degree as to outweigh* the well-being the child would gain in a permanent home with new, adoptive parents.  In other words, the court balances the strength and quality of the natural parent/child relationship in a

18

tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Id*. at p. 575, italics added; *Caden C., supra*, 11 Cal.5th at pp. 631-632.)

A hybrid standard of review applies to the parental-benefit exception. We must find substantial evidence to support a finding that a parent regularly visited and maintained contact with their child, and that the child would benefit from continuing the relationship. (*Caden C., supra*, 11 Cal.5th at pp. 639-640.) A finding that the termination of parental rights would or would not be detrimental to the child, however, is reviewed for abuse of discretion. (*Id*. at p. 640.) This third element requires the court to "assess[] what the child's life would be like in an adoptive home without the parent in his life." (*Ibid*.) "The court makes the assessment by weighing the harm [to the child] of losing the relationship against the benefits [to the child] of placement in a new, adoptive home." (*Ibid*.)

B. The Court Properly Terminated Parental Rights

The court here found there was no dispute that mother visited the children consistently. The court found that mother had a beneficial relationship with S.M. (the second *Caden C*. factor). However, the court did not find that she had a beneficial relationship with R.H.

19

As to R.H., mother contends the court erred in finding no beneficial relationship, since she had quality visits with him for at least five months prior to the section 366.26 hearing. She points out that CFS reported in August 2025 that the parents appeared sober at visits, arrived early, and stayed for the entire visits, and that they interacted and engaged with the children appropriately by eating and playing with them, and holding them and showing affection. Mother further asserts that R.H. was "'calm, smiling . . . crawling, attempting to stand, and falling asleep" in the parents' arms.

To satisfy the second *Caden C*. factor, element, parents "'must show more than frequent and loving contact, an emotional bond with the child, or pleasant visits' [Citations.], they must establish a substantial, positive, emotional attachment between them and the child." (*In re Andrew M*. (2024) 102 Cal.App.5th 803, 816 (*Andrew M*.); *In re Beatrice M*. (1994) 29 Cal.App.4th 1411, 1418 [frequent and loving contact is insufficient to establish the "'benefit from a continuing relationship'" contemplated by the statute].) The evidence mother points to here shows, at most, loving contact, an emotional bond with R.H., and pleasant visits with him. (*Andrew M., supra*, 102 Cal.App.5th at p. 816.)

As to the third *Caden C*. factor, mother argues the court erred in finding that termination of her relationship with the children would not be detrimental to them. In support of her position, mother asserts that the children, and specifically S.M., were observed to be "'smiling, laughing, being vocal, wanting to be held by the parents, playing with the parents, and moving freely in their presence.'"

20

Additionally, S.M. would inquire as to why she could not stay with the parents, which "suggest[ed] some emotional distress in being separated from them." Finally, mother argues that the children will lose a relationship with their new sibling, as she was pregnant.

Mother's interactions with the children do not even begin to demonstrate that their relationship promoted the children's well-being "to such a degree as to outweigh the well-being the child[en] would gain in a permanent home with new, adoptive parents." (*Autumn H., supra*, 27 Cal.App.4th at p. 575.) Mother has not proffered any evidence to support a finding that they had a "substantial, positive emotional attachment [with her] such that the child[en] would be greatly harmed" if the relationship was severed. (*Autumn H.*, supra, 27 Cal.App.4th at p. 575.) To the contrary, the evidence showed that, although the children were happy during the visits, they were fine after the visits and ready to return to the caregivers.

Furthermore, the evidence showed the children were bonded with the caregivers, who were prospective adoptive parents. By the time of the section 366.26 hearing, the children had lived with them for nearly one year. S.M. referred to them as "grandma and grandpa" and looked to them for comfort. The children were bonded with them. The caregivers were meeting all their needs and were committed to raising them to adulthood.

We conclude that mother failed to meet her burden of showing a substantial, positive, emotional attachment between herself and the children such that the children would be greatly harmed if the relationship were terminated.

Therefore, the court did not abuse its discretion by declining to apply the parental-benefit exception under section 366.26, subdivision (c)(1)(B)(i).[2]

III.  Father Has Not Shown Error in Terminating His Parental Rights

Father claims the order terminating parental rights should be reversed since the court deprived him of due process by failing to provide him with the form JV-505, pursuant to section 316.2, subdivision (b), and by failing to consider him S.M.'s presumed father under an "equitable-father analysis."  Father also claims his counsel was ineffective for failing to: (1) pursue his presumed father status as to S.M.; and (2) pursue relief from the jurisdictional findings and the order setting the section 366.26 hearing.[3]  We conclude the court had no duty to provide father with the form JV-505 or to consider him S.M.'s presumed father, and he has failed to establish that he received IAC.

A.  The Court Had No Duty to Father Under Section 316.2, Subdivision (b)

At the outset, we note that father's claims are not clearly delineated.  However, it appears he is essentially claiming he qualified as S.M.'s presumed father; thus, the court should have provided him with a JV-505 form, pursuant to section 316.2, subdivision (b).  We disagree.

"Generally, there are three basic types of fathers in dependency law: presumed, biological, and alleged.  A presumed father is afforded the most rights

[2]  To the extent father joins in mother's arguments as it may inure to his benefit, we also affirm the court's orders.

[3]  Father filed a petition for writ of habeas corpus (E087740) concurrently with his opening brief, also asserting that he was provided IAC.

22

in dependency proceedings, followed by a biological father, who "'has established his paternity but has not established his qualification as a presumed parent.'" [Citation.] An alleged father is just that—a man alleged to be the father, but who has not yet established either presumed father status or biological paternity. A presumed father is afforded standing, the appointment of counsel, and reunification services, while a biological father's access to appointed counsel and services is discretionary. An alleged father has a constitutionally protected due process right to be given notice and an opportunity to appear, to assert a position, and to attempt to change his paternity status." (*In re A.K.* (2024) 99 Cal.App.5th 252, 263.)

"[J]uvenile courts have a duty to determine a child's parentage at the earliest opportunity, imposed both by statute and under the California Rules of Court." (*In re A.H.* (2022) 84 Cal.App.5th 340, 363.) Section 316.2, subdivision (a), states that "[a]*t the detention hearing, or as soon thereafter as practicable*, the court shall inquire of the mother and any other appropriate person as to the identity and address of all presumed or alleged fathers" and, further, it requires the court to ask very specific questions concerning that subject. (§ 316.2, subd. (a), italics added.) It states that "[t]he inquiry shall include at least all of the following, as the court deems appropriate: [¶] (1) Whether a judgment of paternity already exists. [¶] (2) Whether the mother was married or believed she was married at the time of conception of the child or at any time thereafter. [¶] (3) Whether the mother was cohabiting with a man at the time of conception or birth of the child. [¶] (4)

23

Whether the mother has received support payments or promises of support with respect to the child or in connection with her pregnancy. [¶] (5) Whether any man has formally or informally acknowledged or declared his possible paternity of the child, including by signing a voluntary declaration of paternity. [¶] (6) Whether paternity tests have been administered and the results, if any. [¶] (7) Whether any man otherwise qualifies as a presumed father pursuant to Section 7611, or any other provision, of the Family Code." (*Ibid*.)

Section 316.2, subdivision (b) provides that, "[i]f, after the court inquiry, one or more men are identified as an alleged father, each alleged father shall be provided notice . . . alleging that he is or could be the father of the child. The notice shall state that the child is the subject of proceedings under Section 300 and that the proceedings could result in the termination of parental rights and adoption of the child. Judicial Council form Paternity–Waiver of Rights (JV-505) shall be included with the notice."

At the detention hearing here, the court asked mother who R.H.'s father was, and she identified father. In responding to the court's further questioning, mother said she was not married to father or anybody else. The court asked if father ever lived with R.H., and she said he did for a short period of time before she "placed them with [her] aunt." The court asked where father was, and she said he was at home.

The court then asked who S.M.'s father was, and mother said the "possible father" was J.M.[4] The court asked for other possible fathers, and mother said there were three others, including a man named Eric, and others whose names she could not remember. The court asked if anyone signed paternity paperwork when S.M. was born, and she said no. Mother also confirmed that no man had lived with S.M. as her father.

The record demonstrates that the court fulfilled its duty under section 316.2, subdivision (a), and inquired of mother about the identify of S.M.'s father. Mother did not mention father when listing the names of S.M.'s possible father, even after just having identified him as R.H.'s father. In other words, father was not identified as any type of father in S.M.'s case. Father himself later stated that S.M. was already born when he met mother, and he did not become part of her life until she was eight months old. Thus, father had no status with regard to S.M. and was not a party to her case. Accordingly, contrary to his claim, the court had no duty to provide father with the JV-505 form.[5] (§ 316.2, subd. (b).)

---

[4] Mother subsequently testified that J.M. was S.M.'s father.

[5] We note that, under the section of father's brief claiming that he was erroneously denied the benefit of section 316.2, he mentions that the court "did not advise him of the right to appeal from the judgment." He further asserts that, while he "did not pursue writ relief after being advised of the need to do so to preserve his appellate rights from the order scheduling the section 366.26 hearing . . . the juvenile court's failure to comply with section 316.2 as to [him] in [S.M.'s] case should excuse him from seeking writ relief from that order in her case." Although it is unclear exactly what he is claiming, we reiterate that the court had no duty to comply with section 316.2.

B.  The Court Did Not Err in Failing to Declare Father S.M.'s Presumed Father

To the extent father claims he qualified as S.M.'s presumed father, we disagree.  He concedes that he did not meet the statutory criteria of a presumed father under Family Code section 7611.  However, he claims the court erred in not considering him S.M.'s presumed father under an "equitable-father analysis."  In support of his position, he cites *In re D.M.* (2012) 210 Cal.App.4th 541 (*D.M.*), which relied upon the "equitable-father" analysis in *In re Jerry P.* (2002) 95 Cal.App.4th 793 (*Jerry P.*).  Father essentially cites the "equitable-father" analysis without explaining it and simply concludes that such analysis "led to *Jerry P.'s* holding that 'some unwed, nonbiological 'fathers' have a constitutional right to be declared presumed fathers in a dependency case.'"  (*D.M.*, *supra*, 210 Cal.App.4th at p. 550.)

Father's reliance upon *Jerry P.* (and *D.M.*) is misplaced, as the court in *Jerry P.* specified that "[its] task [was] limited to determining whether the holding in *Adoption of Kelsey S.* [(1992) 1 Cal.4th 816 (*Kelsey S.*)] should apply to men who are not biological fathers."  (*Jerry P.*, *supra*, 95 Cal.App.4th at p. 816.)  In simple terms, the question in Kelsey S. was whether an unwed father had a right to withhold his consent to the adoption of his biological child, and it discussed the protection of due process and equal protection rights in that circumstance.  (*Kelsey S., supra*, 1 Cal.4th at pp. 821-822, 849, 851.)

The *Jerry P.* court held that "*Adoption of Kelsey S.* protection should extend to men such as J.R. who [had] demonstrated their commitment to parental

responsibility by meeting the conditions set forth in that opinion." (*Jerry P.,* *supra*, 95 Cal.App.4th at p. 816.) A *Kelsey S.* father was one who: (1) once he "knows or reasonably should know of the pregnancy, he . . . promptly attempt[s] to assume his parental responsibilities as fully as the mother will allow and his circumstances permit," and (2) "is indisputably ready, willing, and able to exercise the full measure of his parental responsibilities . . . . [¶] . . . [¶] . . . emotional, financial, and otherwise." (*Id*. at pp. 816-817; *Kelsey S.*, *supra*, 1 Cal.4th at p. 849.) In determining if a father met the criteria, a court was to consider his "public acknowledgement of paternity, payment of pregnancy and birth expenses commensurate with his ability to do so, and prompt legal action to seek custody of the child." (*Kelsey S.*, *supra*, 1 Cal.4th at p. 849.)

Assuming the *Jerry P*. analysis applies to the instant case, as father claims, he has failed to show he met the conditions of a *Kelsey S.* father. Father merely asserts that he owned the house where he, mother, and S.M. lived, worked full-time, and told the social worker that if he was not R.H.'s biological father, he would still care for both R.H. and S.M. Further, he alleges he had been S.M.'s "father figure" since she was eight months old, and she called him "Dad." We conclude these bare assertions do not come near to demonstrating that father was "indisputably ready, willing, and able to exercise the full measure of his parental responsibilities . . . . [¶] . . . [¶] . . . emotional, financial, and otherwise," as set forth in *Kelsey S.* (*Jerry P*., *supra*, 95 Cal.App.4th at p. 816; *Kelsey S.*, *supra*, 1 Cal.4th at p. 849.) We note that father did not meet mother until after S.M. was

born and admitted he did not become a part of her life until she was eight months old. Further, there is no indication of him taking "prompt legal action to seek custody" of her. (*Kelsey S.*, *supra*, 1 Cal.4th at p. 849.)

We conclude that, even if the "equitable-father" analysis applied, father would not qualify as S.M.'s presumed father under such analysis.

## C. Father Has Failed to Establish He Received IAC

Father claims his counsel rendered ineffective assistance, since counsel: (1) failed to pursue his presumed father status over S.M.; and (2) failed to seek relief from the court's jurisdictional findings and the order setting the section 366.26 hearing. Father's IAC claim fails.

As to the claim regarding his counsel failing to seek presumed father status over S.M, the core problem is that father was not a party to S.M.'s case, as he was not identified as any type of father to her. (See § III. A., *ante*.) "A father's status is significant in dependency cases because it determines the extent to which the father may participate in the proceedings and the rights to which he is entitled." (*In re T.R.* (2005) 132 Cal.App.4th 1202, 1209.) Since father had no status in S.M.'s case, he had no apparent right to participate in her proceedings or right to counsel with regard to her case. (Compare, *Ibid*. [presumed father status entitles the father to appointed counsel].)

In any event, father was represented by counsel in R.H.'s case. To the extent father argues his counsel in that case erred in failing to seek presumed father status over S.M., such claim fails. "Under the standard test for a claim

28

of ineffective assistance of counsel, father is required to demonstrate both that counsel's representation fell below an objective standard of reasonableness and resulting prejudice." (*In re N.M.* (2008) 161 Cal.App.4th 253, 270.) "A court may reject a claim of ineffective counsel if the party fails to show the result would have been more favorable but for trial counsel's failings." (*Ibid.*)

Father has not demonstrated that he was prejudiced by his counsel's failure to seek presumed father status in S.M.'s case. As explained above, there is no indication he would have qualified for presumed father status. (See § III. A. & B., *ante*.)

As to father's claim that his counsel was ineffective for failing to appeal the court's jurisdictional findings and failing to seek writ relief from the order scheduling the section 366.26 hearing, such claim also fails. First, father argues his counsel failed to raise the issue that CFS did not meet its burden of proof regarding the jurisdictional findings under section 300, subdivision (b). "[U]nder section 300, subdivision (b), a child may be subject to dependency jurisdiction if the child has suffered, or there is a substantial risk the child will suffer, serious physical harm or illness as a result of a parent's failure or inability to adequately supervise the child, or as a result of a parent's inability to provide regular care for the child due to the parent's substance abuse." (*In re B.D.* (2024) 103 Cal.App.5th 315, 324.)

The evidence here showed that mother tested positive for amphetamines when she gave birth to R.H. on August 25, 2024, even though she denied taking

29

drugs while she was pregnant. Mother tested positive for amphetamines again a few weeks later; yet she still insisted she was not using drugs. Moreover, mother said she started using amphetamines at age 14, stopped, then used again at age 17 until she got pregnant with S.M. Mother reported that she had never been in a treatment program.

Additionally, father tested positive for amphetamines on August 29, 2024, and refuted the test results, similarly stating he did not use drugs. However, he later admitted to using drugs, stating he had used methamphetamines on and off since he was 14 years old and had never been in a treatment program.

In light of this evidence, we cannot say that father was prejudiced by his counsel not raising the issue of CFS's alleged failure to meet its burden to prove jurisdiction under section 300, subdivision (b). Proof was required only by a preponderance of the evidence. (§ 355, subd. (a).) There was ample evidence to support a finding under that standard that mother's and father's substance abuse issues would affect their ability to parent R.H., especially in light of both of them denying drug use despite testing positive, and their long histories of drug use with no treatment; further, mother admittedly drank a bottle of wine every two days and apparently smoked marijuana to calm her nerves. Father has not demonstrated the result would have been more favorable to him had his counsel objected.

Father additionally argues that the evidence did not support CFS's allegation under section 300, subdivision (g) that S.M.'s alleged father's absence left her without adequate supervision. To the extent father is arguing his counsel

30

was ineffective for raising this issue, his claim fails, as the section 300, subdivision (g) allegation was made against J.M., who was the alleged father in S.M.'s case. Since father was not a party to S.M.'s case, his counsel had no reason to raise the issue.[6]

Finally, father has failed to demonstrate he was prejudiced by his counsel's failure to seek writ relief from the order scheduling the section 366.26 hearing. In support of this argument, he claims "[his] counsel 'could hardly be expected' to advise him on a writ questioning counsel's competence, assuming his counsel even considered that counsel's competence was at issue . . . [a]nd counsel did not even make it an issue when he prepared [his] section-388 petition, which contains no mention of the issue." This claim is unclear. In any event, father has apparently raised the IAC issue more extensively in his writ of habeas corpus, which this court will rule on in a separate order.

Ultimately, we conclude the court properly denied mother's section 388 petition, and it properly terminated mother's and father's parental rights.

---

[6] We note that, in his reply brief, father concedes that the "nature of [his] counsel's appointment . . . limited to [R.H.'s] case."

DISPOSITION

The court's orders are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS _____
J.

We concur:

RAMIREZ _____
P. J.
RAPHAEL _____
J.